## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW MEXICO

In re:  DANNY ROSS SPLAWN and                                   No. 7-05-19019 MA
        MARY ALICE SPLAWN,

        Debtors.
_____

QUICKEN LOANS, INC.,

        Plaintiff,

v.                                                              Adversary No. 06-1010 M

DANNY R. SPLAWN and
M. ALICE SPLAWN,

        Defendants.

### <u>MEMORANDUM OPINION</u>

This adversary proceeding to determine whether the Defendants are entitled to receive a discharge stems from Defendants' personal use of proceeds from the sale of certain real property that should have been used to pay off a loan Plaintiff extended to the Defendants.  The Court held a trial on the merits and took the matter under advisement.   Plaintiff asserts that the Defendants' discharge should be denied under 11 U.S.C. § 727(a)(2)(A), 11 U.S.C. § 727(a)(2)(B), 11 U.S.C. § 727(a)(3), 11 U.S.C. § 727(a)(4)(A), and/or 11 U.S.C. § 727(a)(5).[1] Based on the evidence and testimony presented at trial, the Court finds that the Defendants' discharge should be denied under § 727(a)(2)(A).

### FACTS

_____

[1]All subsequent statutory references in this Memorandum will be to Title 11 of the United States Code unless otherwise indicated.

Case 06-01010-m    Doc 44    Filed 09/17/07    Entered 09/17/07 09:24:11 Page 1 of 21

In August 2004 Defendants owned certain real property located at 1105 Sagebrush Trail SE, Albuquerque, New Mexico ("Sagebrush Property").   On August 18, 2004, Defendant Mary Alice Splawn executed a Home Equity Line Agreement, Disclosure Statement and Note ("Note") in favor of Plaintiff Quicken Loans, Inc. ("Quicken") in the amount of $64,400.00.   To secure the Note, Defendants Mary Alice Splawn and Daniel Splawn executed and delivered a Line of Credit Mortgage ("Mortgage") on the Sagebrush Property to Quicken.  The purpose of the loan was to enable the Defendants to access the equity in the Sagebrush Property and use it as a downpayment for the purchase of a new home, pending the sale of the Sagebrush Property, when the Note would be paid in full.  (*Testimony of Louise Tomala).*  On October 15, 2004, when Quicken contacted Defendant Danny Splawn regarding the Note and Mortgage, he informed Quicken that Defendants would be closing on the sale of the Sagebrush Property that day. (*Testimony of Julie Elkins;* Plaintiff's Exhibit 4).

Defendants sold the Sagebrush Property to Riley and Alice Kilgo (together, the Kilgos) on October 15, 2004 and transferred the Sagebrush Property to the Kilgos by warranty deed. (*See* Plaintiff's Exhibit 18  - Closing Statement; Plaintiff's Exhibit 21 - Warranty Deed).  Defendants knew at the time of the sale of the Sagebrush Property to the Kilgos that Quicken had a security interest in the Sagebrush Property and a security interest in the proceeds from the sale of the Sagebrush Property.

At the closing of the sale of the Sagebrush Property, the title company determined that Quicken did not have a recorded mortgage against the Sagebrush Property.   Proceeds from the sale of the Sagebrush Property in the amount of $75,764.34 ("Proceeds") were disbursed to the Defendants at closing. *Id.*   Quicken recorded its Mortgage against the Sagebrush Property on

2

December 7, 2004, after the closing of the sale of the Sagebrush Property. (*See* Plaintiff's Exhibit 2). Defendants did not use the Proceeds to pay off the balance of the Note. Instead, when Quicken contacted Defendant Danny Splawn by telephone in December of 2004 and on January 3, 2005 to inquire about the sale of the Sagebrush Property, he informed Quicken that the Proceeds were "invested" and could not be used to pay off the Note, and that he intended to continue making the regular monthly payments under the Note. (*Testimony* of Julie Elkins; Plaintiff's Exhibit 5; Defendants' Exhibit Q). In fact, Defendants placed the Proceeds into a separate account (Account No. 5) at New Mexico Educators Federal Credit Union ("NMEFCU"). (*See* Plaintiff's Exhibit 30A). They then transferred those funds into their checking account over the next several months and used them to pay general household expenses. (*See* Plaintiff's Exhibits 30A-K). Several of the documented transfers of the Proceeds from Account No. 5 to the Defendants' checking account were used to pay off the balances on several credit cards. (*See* Plaintiff's Exhibits 30A-K, specifically, Exhibit 30A, p. 2 reflecting online credit card payment of $7,784.21 on October 21, 2004; Exhibit 30B, p. 2 reflecting online credit card payment of $4,067.19 on November 26, 2004; Exhibit 30C, p.2 reflecting online credit card payments of $2,051.05 and $324.33 on December 14, 2004, and online credit card payment of $4,202.21 on December 23, 2004). Credit card statements documenting the expenditures represented by the payments were not offered into evidence. By mid-May of 2005, all of the Proceeds had been spent.

Defendant Danny Splawn has been a licensed insurance agent since 1990. He sells both life insurance policies and other annuities. As a licensed insurance agent, Mr. Splawn receives commissions on policies he sells, including some residual renewal commissions associated with

some of the policies he sells. He also receives a commissions on renewal policies from work done by sub-producers, other agents who work under him. Defendant Danny Splawn received certain renewal commissions after the date that he filed is bankruptcy petition that relate to policies he sold pre-petition.

In April of 2005, Defendants formed a Colorado corporation under the name DRS & Associates Inc. (*See* Plaintiff's Exhibit 41). The purpose of DRS & Associates Inc. was to change Defendant Danny Splawn's business operation of selling life insurance policies and annuities from a sole proprietorship to a corporation. Although DRS & Associates Inc. was formed in 2005 and opened a bank account, Defendants filed their 2005 tax return based on the operation of Defendant Danny Splawn's business only as a sole proprietorship. Defendants also formed a Colorado limited liability company under the name DRS & Capital LLC in April of 2005. The purpose of DRS & Capital LLC was to receive payments Defendant would earn from training other insurance agents. A bank account was opened for DRS & Capital LLC in November of 2005, and deposits representing payments from Freedom Equity Group were made to the DRS & Capital LLC bank account in November of 2005. Defendants have ownership interests in DRS & Associates, Inc. and DRS & Capital LLC.

Defendants filed a voluntary petition under Chapter 7 of the Bankruptcy Code on October 5, 2005. The October 2004 sale of the Sagebrush Property was not disclosed on the Defendants' statements and schedules. Defendants testified that they did not disclose the sale of the Sagebrush Property on the statements and schedules because they believed, based on a copy of the sales contract and a copy of estimated closing costs, that the transaction occurred more than one year prior to the date of the filing of the petition. Defendants testified further that they did

4

not have access to any other documents relating to the sale of the Sagebrush Property because they were put in storage when they moved to Colorado. Defendants did not contact the title company to determine when, in fact, the sale of the Sagebrush Property closed.

Defendants' interests in DRS & Capital LLC were not disclosed on the Defendants' statements and schedules. Defendants did not specifically identify the residual insurance commissions from policies sold pre-petition, though they included the expected payments from these commissions in their projected business income reported on Schedule I. Following the meeting of creditors, Defendants amended Schedule B to reflect their interest in "potential and contingent residual commissions under executory contracts" and their interest in DRS & Capital, LLC, with an estimated value of $0.00, reporting that it was not capitalized. Defendants also amended Schedule G to reflect executory contracts with AEGON Insurance Group, AVIVA Life Insurance Company and Fidelity & Guaranty Life Insurance Company, and amended their Statement of Financial Affairs to reflect the sale of the Sagebrush Property to the Kilgos. Defendants made no further amendments to their statements or schedules.

DISCUSSION

Quicken contends that the Defendants should not receive a discharge based on § 727(a)(2)(A), (a)(2)(B), (a)(3), (a)(4)(A), and (a)(5). Those code sections provide:

> The court shall grant the debtor a discharge , unless –
> . . . .
> > (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed --
> > > (A) property of the debtor, within one year before the date of the filing of the petition; or
> > > (B) property of the estate, after the date of the filing of the petition;
> > (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or

5

preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case–
   (A) made a false oath or account;
   . . . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a)(2)(A) and (B), (a)(3), (a)(4), and (a)(5).

### Section 727(a)(2)(A) and (B) - concealment or transfer with fraudulent intent

Quicken asserts that Defendants' sale of the Sagebrush Property and use of the Proceeds other than to pay Quicken falls within the exception to discharge under § 727(a)(2)(A) and (B). To obtain a denial of discharge under § 727(a)(2)(A), the plaintiff must prove each of the following elements by a preponderance of the evidence: (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the filing of the bankruptcy, (4) with the intent to hinder, delay, or defraud a creditor. *Gullickson v. Brown,* 108 F.3d 1290, 1293 (10th Cir. 1997).

Section 727(a)(2)(A) and (B) both require proof of the debtor's intent to hinder, delay, or defraud a creditor or officer of the estate. 11 U.S.C. § 727(a)(2)(A) and (B). Intent to hinder, delay, or defraud under these sections may be shown through circumstantial evidence from which the Court may infer actual intent to hinder, delay or defraud creditors. *In re Herrman,* 355 B.R. 287, 292 (Bankr.D.Kan. 2006) (noting that discharge may be denied under § 727(a)(2)(A) when the court is "persuaded, either by direct evidence or by inference from the facts and circumstances of the Debtor's conduct, that he made the transfers with the actual intent to hinder, delay, or defraud the Plaintiff.") (citations omitted); *In re Lang,* 246 B.R. 463, 469

6

(Bankr.D.Mass. 2000), *aff'd,* 256 B.R. 539 (1st Cir. BAP 2000) (noting that because "no debtor

will admit to an improper intent . . . . [t]he Court must therefore consider the surrounding facts

and circumstances and draw inferences of a debtor's actual intent from that debtor's

actions.")(citations omitted).   In addition, there is no requirement that the debtor intend to

hinder, delay, or defraud *all* of his or her creditors; "the statute requires only that the debtor

make the transfer with intent to hinder, delay, or defraud 'a creditor.'" *Aweida v. Cooper (In re

Cooper),* 150 B.R. 462, 467 (D.Colo. 1993) (citing *First Beverly Bank v. Adeeb (In re Adeeb),*

787 F.2d 1339, 1343 (9th Cir. 1986)).   When considering whether a debtor's conduct supports an

inference of fraudulent intent, courts have identified certain "badges of fraud," the presence of

which may suggest an intent to hinder, delay, or defraud within the meaning of § 727(a)(2).

These indicia of fraud include:

> (1) concealment of prebankruptcy conversions; (2) conversion of assets immediately
> before the filing of the bankruptcy petition; (3) gratuitous transfers of property; (4)
> continued use by the debtor of transferred property; (5) transfers to family members; (6)
> obtaining credit to purchase exempt property; (7) conversion of property after entry of a
> large judgment against the debtor; (8) a pattern of sharp dealing by the debtor prior to
> bankruptcy; (9) insolvency of the debtor resulting from the conversion of the assets; and
> (10) the monetary value of the assets converted.

> *Herrman,* 355 B.R. at 292 (citing *Marine Midland Business Loans, Inc. v. Carey (In re
> Carey),* 938 F.2d 1073, 1077 & n. 4 (10th Cir. 1991)).

Other circumstances evidencing actual intent to defraud under § 727(a)(2)(A) include "the

financial condition of the party sought to be charged both before and after the transaction in

question; . . . the existence of a pattern or series of transactions after the onset of financial

difficulties, or pendency or threat of suits by creditors; and . . . the general chronology of the

events and transactions under inquiry." *Cooper,* 150 B.R. at 465.

§727(a)(2)(B) - concealment of property of the estate post-petition

Quicken asserts that after the filing of the Defendants' bankruptcy proceeding, Defendants transferred, removed, or concealed, or permitted the transfer, removal or concealment of their interest in agency agreements with insurance companies and their right to receive residual commissions on policies sold pre-petition, with the intent to hinder, delay, or defraud Quicken within the meaning of § 727(a)(2)(B). The facts do not support a denial of the Defendants' discharge under § 727(a)(2)(B). Although Defendants did not disclose the agency agreements in their initial statements and schedules, they reported the projected business income from anticipated residual commissions on their Schedule I. They later amended Schedule G to reflect all agency agreements. The Court cannot infer from these facts an intent on the part of Defendants to hinder, delay, or defraud Quicken or the estate. Nor does it appear from the facts that Defendants intentionally attempted to conceal their interest in the agency agreements or their right to receive residual commissions.

§727(a)(2)(A) - transfer of property within one year of the petition

Quicken has also failed to sustain its burden under § 727(a)(2)(A) with regard to the Defendants' sale of the Sagebrush Property to the Kilgos in October of 2004. While the sale of the Sagebrush Property occurred within one year of the date of the filing of Defendants' petition, the requisite indicia of fraud are not present. The Kilgos are not insiders or family members. The Defendants did not retain possession of the Sagebrush Property following the sale. The sale was not concealed. The sale closing which occurred nearly a year prior to the filing of the Defendants' bankruptcy proceeding was conducted by a title company, and the warranty deed conveying the Sagebrush Property to the Kilgos was promptly recorded. Until the title company informed the Defendants at closing that there was no recorded mortgage in favor of Quicken

encumbering the Sagebrush Property, Defendants anticipated and expected that a portion of the Proceeds would be used to pay off Quicken's Note and Mortgage. The testimony and evidence before the Court indicate that the Defendants informed the title company of the Quicken's encumbrance on the Sagebrush Property and that the title company attempted to contact Quicken to ascertain the existence and nature of the lien. Thus, at least with regard to the sale of the Sagebrush Property, the evidence surrounding the nature of the transaction and the motive for the sale do not indicate an intent to defraud.

The Defendants' disposition of the Proceeds following the sale of the Sagebrush Property, however, satisfies all elements necessary to deny the Defendants' discharge under § 727(a)(2)(A). The use of the Proceeds constitutes a "transfer" within the meaning of § 727(a)(2)(A). *See In re Elholm,* 80 B.R. 964, 966, n.1 (Bankr.D.Minn. 1987) (noting that the debtor's application of the cash proceeds from the sale of property to various purposes constituted a "transfer" within the meaning of § 727(a)(2)(A))(citing *McCormick v. Security State Bank,* 822 F.2d 806, 808 (8th Cir. 1987)). The transfers occurred within one year of the date of the filing of the Defendants' bankruptcy petition. While several of the typical "badges of fraud" are inapplicable to the facts surrounding the Defendants' use of the Proceeds, intent to defraud within the meaning of § 727(a)(2)(A) can nevertheless be inferred from other circumstantial evidence. *See In re Spitko,* 357 B.R. 272, 301 (Bankr.E.D.Pa. 2006) (noting that "because courts recognize that a debtor will be reluctant to admit that he was motivated by fraud, they have permitted fraudulent intent to be inferred from circumstantial evidence or a course of conduct.")(citation omitted).

Defendants used the Proceeds even though they knew Quicken had an interest in them.

9

Had Quicken recorded its mortgage immediately, the Proceeds would have been properly disbursed to Quicken at the closing of the sale of the Sagebrush Property in satisfaction of Quicken's loan to Defendants. Thus, Quicken's predicament can largely be blamed on the breakdown of its own internal loan practices. Nevertheless, the Defendants took the Proceeds at a time when they knew that Quicken had a security interest in the form of an (albeit unrecorded) mortgage against the Sagebrush Property. Their subsequent disposition of the Proceeds when they knew Quicken had an interest in them constitutes a transfer of property made with the intent to hinder, delay or defraud a creditor within the meaning of § 727(a)(2)(A). *Cf. In re Barnes,* 369 B.R. 298, 308-309 (Bankr.W.D.Tex. 2007) (concluding that the debtor's discharge should be denied under § 727(a)(2)(A) based on debtor's transfer of assets in knowing violation of bank's security interest, and while deceiving bank into thinking there was no pending sale, even though proceeds were used to pay other creditors).

Even though the Defendants were able to document where the Proceeds were spent, this does not mitigate the fact that the Defendants' dissipated the Proceeds in contravention of Quicken's unrecorded lien. And when Quicken contacted Defendants to inquire about the sale of the Sagebrush Property, Defendants first made assurances that Quicken would be paid, and then told Quicken the Proceeds were "invested" when, in fact, the Defendants simply spent the Proceeds as they saw fit. Despite their knowledge of Quicken's interest in the Proceeds, they did not use the Proceeds to pay Quicken's Note. Instead, they used the Proceeds on personal and household expenses, including paying off significant credit card balances, and dissipated the entire amount in less than seven months. Defendants continued to use the remainder of the Proceeds for their own personal expenses even after Quicken contacted them by phone to inquire

10

about the sale of the Sagebrush Property and to demand payment.[2]   Because the Defendants

used the Proceeds for their personal expenses despite their knowledge of Quicken's interest in

the Proceeds and despite Quicken's demand for payment, the Court finds that the Defendants'

discharge should be denied under § 727(a)(2)(A).   *Cf.  In re Boughner,* 173 B.R. 406, 410-411

(Bankr.S.D.Iowa 1994)(discharge denied under § 727(a)(2)(A) based on debtor's transfer

property in which creditor held improperly perfected security interest for inadequate

consideration without notifying plaintiff, and based on debtor's retention of proceeds from sale

of wrecked vehicle also pledged as security for the loan).

Because the Court finds that Defendants' discharge should be denied under § 727(a)(2),

the Court need not consider whether denial of discharge is warranted under the other provisions

raised by Quicken.   But because the evidence also pertains to Quickens causes of action under §

727(a)(3), (4), and (5), the Court will also consider those sections.

### Section 727(a)(3) - failure to maintain records

Pursuant to § 727(a)(3), a debtor will not be entitled to receive a discharge if he or she

has failed to preserve or maintain adequate records from which the debtor's financial condition,

or business transactions can be ascertained.  11 U.S.C. § 727(a)(3).  To prevail under this

section, the party seeking a denial of discharge must show that the debtor  "failed to maintain

and preserve adequate records and that the failure made it impossible to ascertain his financial

condition and material business transactions." *Brown,* 108 F.3d at 1295.  There is no intent to

---

[2]*See* Defendants' Exhibit Q - e-mail chain documenting phone call on January 3, 2005
from Quicken to Defendants; Defendants' Exhibit P (QLI 178) - Default letter dated 1/26/05,
reflecting that letter was sent to Defendants' new address; Plaintiff's Exhibit 30E-H - Bank
Statements reflecting transfers from Account 5 on 1/3/05, 1/5/05, 1/7/05, 1/26/05, 1/31/05, and
2/22/05)

11

defraud requirement contained within this section.  *See In re Waldroop,* 22 B.R. 284, 286

(Bankr.D.N.M. 1982) (noting that under § 727(a)(3) the creditor must show a lack of records, but

is not required to intent to defraud on the part of the debtor).   It is the plaintiff's burden to show

that the debtor's records are inadequate; once that showing has been made, the debtor must offer

a sufficient explanation to justify the insufficiency of the records.[3]

   "The long-standing rule in the Tenth Circuit is that: 'Records need not be so complete

that they state in detail all or substantially all of the transactions taking place in the course of the

business.  It is enough if they sufficiently identify the transactions that intelligent inquiry can be

made respecting them.'"  *In re Stewart,* 263 B.R. 608, 615 (10th Cir. BAP 2001), *aff'd,* 35

Fed.Appx. 811 (10th Cir. 2002) (quoting *Hedges v. Bushnell*, 106 F.2d 979, 982 (10th Cir.1939)).

 Whether the records are sufficient lies within the Court's discretion.  *Clark v. Kearns (In re*

*Kearns),* 149 B.R. 189, 191 (Bankr.D.Kan. 1992)(citing *In re Pimpinella,* 133 B.R. 694, 698

(Bankr.E.D.N.Y. 1991)).

   Although the Defendants' records do not provide a complete explanation of their

financial transactions, the Court finds that Defendants' discharge should not be denied under this

section.   The evidence shows that Defendants deposited the Proceeds into a separate account

from which they transferred the Proceeds to their checking account and then used the Proceeds

to pay expenses.  Defendants' bank account statements, admitted at trial, clearly reflect the

---

   [3]*See In re Stewart,* 263 B.R. 608, 615 (10th Cir. BAP 2001), *aff'd,* 35 Fed.Appx. 811 (10th
Cir. 2002) (stating that "a prima facie case under this section requires the creditor to show that
the debtor 'failed to maintain and preserve adequate records and that the failure made it
*impossible* to ascertain his [or her] financial condition and *material* business transactions'" and
that "[i]f the creditor makes such a showing, the burden then shifts to the debtor to justify his or
her failure to maintain the records.")(quoting *Brown,* 108 F.3d at 1295)(emphasis in original)).

deposit of the Proceeds into a separate account (Account 5), and show the subsequent transfers

of the Proceeds to the Defendants' checking account, from which expenses were paid.  From a

simple review of the bank account statements, it is clear when and in what amounts the Proceeds

were expended.  But what is not clear from the bank account statements, is the nature of all of

the expenditures.  Debit transactions are identified by name in the bank statements, but checks

drawn on the account do not reflect the payee.   Several of the debit entries reflecting "online

credit card payments" are in excess of $4,000.00, yet no copies of the underlying credit card

statements from which individual expenditures could be identified were provided.  Absent a

copy of the checks themselves, the check register, or the credit card statements, it is impossible

to ascertain from the bank account statements the nature of those expenditures.   At trial,

Defendant testified that he did not have copies of the underlying credit card statements, and

testified from the bank account statements as to the nature many of the expenditures.   In

defending a § 727(a)(3) cause of action, however, a debtor "may not use oral testimony to

supplement information that is absent from the actual records" *Kearns,* 149 B.R. at 191.

The question, then, is whether the bank statements and the few receipts documenting

some of the remodeling expenses[4] submitted by the Defendants constitute a sufficient record

from which the Defendants' financial condition could  be ascertained.  Faced with a claim that

the records were inadequate to fully explain the Defendants' financial condition,  Defendant

---

[4]Debtor provided copies of receipts totaling approximately $24,000.00 attributable to
remodeling/home improvement; yet Defendant testified at the § 341 meeting of creditors that
between $50,000.00 and $60,000.00 of the Proceeds were used to upgrade the new house.  (*See*
Exhibit 27 - Receipt from Home Depot for $2,541.08; Exhibit 28 - Receipt from ProSource for
carpet in the amount of $4,165.76; Exhibit 29 - Receipt for construction costs in the amount of
$15,500.59).

should have produced credit card statements to document the lump sum payments reflected in the bank account statements.   His testimony that the Proceeds were used to pay off credit card balances and that many of the expenditures covered everyday living expenses fails to satisfy the Defendant's burden upon a showing that the records produced are insufficient.  But because at least some receipts documenting the home improvements were provided, and because bank account statement identified many of the expenses, the Court cannot conclude that the records produced were so wholly inadequate as to make it impossible to ascertain the Defendants' financial condition.  The Debtor spent the Proceeds, and the bank account statements reflect that fact.  The Court, therefore, finds that the Defendants' discharge should not be denied under § 727(a)(3).  *Cf. In re Jennings,* 349 B.R. 897, 914 (Bankr.M.D.Fla. 2006) (finding that debtor's bank statements were sufficient to permit a creditor to determine "with substantial completeness and accuracy Defendant's present and past financial condition" despite the fact that defendant was unable to provide receipts for certain cash withdrawals).

Bank statements on accounts associated with the Defendants' two business entities, DRS & Associates, Inc. and DRS & Capital LLC, were also admitted at trial.  The statements show that Defendants did not use the bank accounts for the two business entities until after the petition was filed.   Pre-petition, Defendant Danny Splawn operated his business as a sole proprietorship, and business income was deposited in a non-business account.  However, it was clear from the bank account records which income related to his commissions on sales of life insurance policies.  Thus, although Defendant operated a business from which income was deposited in a non-business account, the Court finds that the Defendants' records were not so inadequate that their business income and financial condition could not be ascertained.  The

Case 06-01010-m    Doc 44    Filed 09/17/07    Entered 09/17/07 09:24:11  Page 14 of 21

Defendants' discharge, therefore, cannot be denied based on Defendants' failure to maintain adequate business records under §727(a)(3).

### Section 727(a)(4)- False Oath

Quicken asserts that the Defendants' failure to disclose in their statements and schedules the sale of the Sagebrush Property, the transfer(s) of the Proceeds, their interest in DRS & Capital LLC and their interest in Defendant Danny Splawn's agency agreements and right to receive residual commissions constitute false oaths within the meaning of § 727(a)(4). To prevail on a claim for denial of discharge under § 727(a)(4), the plaintiff must establish the following elements by a preponderance of the evidence: (1) that the debtor made a statement under oath; (2) that the statement was false; (3) that the debtor knew the statement was false; (4) that the debtor made the statement with intent to defraud; and (5) that the statement related materially to the debtor's bankruptcy case. *In re Egsti,* 323 B.R. 778, 783-84 (Bankr.M.D.Fla. 2005).

A debtor's statements contained in his or her bankruptcy petition, schedules, statement of financial affairs, as well as statements at the § 341 creditors meeting and testimony at a Rule 2004 examination all constitute statements made under oath for purposes of § 727(a)(4). *In re Broholm,* 310 B.R. 864, 880 (Bankr.N.D.Ill. 2004). Omissions in a debtor's statements and schedules can constitute false oaths within the meaning of § 727(a)(4). *In re Reed,* 293 B.R. 65, 69 (Bankr.D.Kan. 2003) (citing *In re Calder,* 907 F.2d 953, 955 (10th Cir. 1990) (citing *Farmers Co-op Ass'n v. Strunk,* 671 F.2d 391, 395 (10th Cir. 1982)). However, "[t]o trigger section 727(a)(4)(A), the false oath must relate to a material matter and must be made willfully with intent to defraud." *Calder,* 907 F.2d at 955 (citing 4 Collier on Bankruptcy ¶ 727.04[1] at

15

727-54 to -57 (15th ed.1987)). In addition, "a discharge cannot be denied when items are omitted from the schedules by honest mistake." *In re Lee,* 309 B.R. 468, 477 (Bankr.W.D.Tex. 2004) (citing *Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir. 1992) (remaining citation omitted)).

The sale of the Sagebrush Property was not disclosed on Defendants' statements and schedules filed with the petition. Nor were the Defendants' interests in residual commissions specifically identified in their statements and schedules. Defendants did not list their interests in DRS & Capital LLC in their statements and schedules either. But at the § 341 creditor's meeting, Defendant Danny Splawn confirmed when questioned by counsel for Quicken that the Sagebrush Property was sold in October of 2004, within one year of the date of the filing of the Defendants' bankruptcy petition. At trial Defendant Danny Splawn said that he did not list the sale of the Sagebrush Property in the statements and schedules filed with the petition because he believed, based on a copy of a projected closing statement, that the transaction occurred more than one year prior to the date of the filing of the Defendants' bankruptcy petition. In addition, Defendants amended their Statements and Schedules following the § 341 meeting of creditors to disclose the sale of the Sagebrush Property, to list their interest in residual commissions, and their interest in DRS & Capital, LLC with an estimated value of $0.00, based on the fact that the business entity had not been capitalized. The residual commissions, while not separately disclosed in their schedules, were included as part of the projected business income reported on Schedule I. While amendments to schedules do not serve to nullify false statements in (or

16

omissions from) a debtor's initial schedules[5], in this case, the Court finds that the misstatements were not intentionally fraudulent within the meaning of § 727(a)(4).[6] The business income from residual commissions was disclosed as part of their projected income on Schedule I, and although DRS & Capital, LLC was formed, the Defendants were not actively using this business entity as of the petition date. Defendant Danny Splawn explained that the sale of the Sagebrush Property was omitted from the schedules because he believed the sale closed more than a year prior to the petition date based on a closing statement; the sale, in fact, occurred just ten days before the expiration of the one-year lookback period.

### Section 727(a)(5) - failure to explain loss or disposition of assets

Quicken seeks a denial of the Defendants' discharge under § 727(a)(5) based on Defendants' failure to adequately explain the loss or disposition of the Proceeds which would otherwise have been available to satisfy the Defendants' liability to Quicken. Under this section, Quicken bears the initial burden of showing that a loss or shrinkage of assets has occurred; the burden then shifts to the Defendants to offer a satisfactory explanation of the loss

---

[5]*See Law Office of Larry A. Henning v. Mellor (In re Mellor)*, 226 B.R. 451, 459-460 (D.Colo. 1998) (acknowledging that "a debtor's voluntary filing of an amendment as soon as practicable may be accepted as evidence of the absence of the element of the fraudulent intent necessary to sustain a § 727(a)(4)(A) claim" but concluding that "[a]n inference of fraud is permissible, however, when the evidence indicates that the amendment is not in fact voluntary because the amendment is offered only as a result of developments during the meeting of creditors, after the debtor 'knew that the cat was out of the bag,' well after the meeting of creditors, or without adequate explanation of the reason for their initial inaccuracy.")(citations omitted).

[6]*Cf. In re Arbaney,* 345 B.R. 293, 310 (Bankr.D.Colo. 2006) (finding that discharge would not be denied under § 727(a)(4) based on omissions in bankruptcy schedules where debtor corrected the omissions on his own volition, where the omissions did not pertain to valuable assets, and where debtor was not financially or legally sophisticated).

17

or dissipation of the assets. *United States v. Dorman (In re Dorman)*, 98 B.R. 560, 571 (Bankr.D.Kan. 1987) (citations omitted). When proceeding under § 727(a)(5), "it is unnecessary for the party objecting to discharge to prove or even allege fraudulent acts or a corrupt motive on the part of the debtor." *In re Phouminh,* 339 B.R. 231, 247 (Bankr.D.Colo. 2005). *See also, In re Keck,* 363 B.R. 193, 206 (Bankr.D.Kan. 2007) ("[A] creditor or trustee does not have to show fraudulent intent to succeed on a claim under § 727(a)(5).")(citation omitted).

It is undisputed that Defendants received $75,764.34 upon the closing of the sale of the Sagebrush Property in October of 2004. *See* Plaintiff's Exhibit 18 - Settlement Statement from sale of Sagebrush Property. By Defendants' own admission, the entire Proceeds from the sale of the Sagebrush Property were exhausted by May of 2005. This is sufficient to sustain Quicken's burden of showing a loss or diminution in assets within the meaning of § 727(a)(5). *Cf. In re Reed,* 310 B.R. 363, 369-370 (Bankr.N.D.Ohio 2004) (pre-petition use by debtor of proceeds from sale of property in the amount of 54,368.67 established loss of asset that could have been used to pay creditors). The burden then lies with Defendants to come forward with evidence that satisfactorily explains the disposition of the Proceeds from the sale of the Sagebrush Property. *See Reed,* 310 B.R. at 369 (once the plaintiff has established the existence of a "loss or the deficiency of a pre-petition asset that could have been used to pay creditors . . . . the burden then shifts to the debtor to come forward with evidence that will satisfactorily explain the loss of the asset.") (citing *Manhattan Leasing Sys., Inc., v. Goblick (In re Goblick),* 93 B.R. 771, 775 (Bankr.M.D.Fla. 1988)).

At trial Defendant Danny Splawn testified based on the bank account statements the nature of the expenditures for each check and online transfer that he could recall. The transfers

18

from Account 5, in which the Proceeds were initially deposited, to Account No. 2 are clearly documented in the bank account statements. Similarly the bank account statements itemize by amount each withdrawal or check drawn on the account. However, as already noted above, not all items drawn on the account are specifically identified by payee. The online credit payments reflected on the bank account statements are simply identified as such, without detailing the individual expenses associated with the lump sum balances the Defendants paid on their credit cards using a portion of the Proceeds. Defendants did not produce the credit card statements which would include an itemization of the credit card expenditures.

Section 727(a)(5), however, "is not concerned with the propriety of the circumstances surrounding the loss of the property." *Reed,* 310 B.R. at 371. A satisfactory explanation for a loss or dissipation of assets "under § 727(a)(5) is one that is reasonable under the circumstances." *Id.* at 370 (citation omitted). A vague or indefinite explanation is not sufficient. *See Phouminh,* 339 B.R. at 248 (finding that an explanation "in general terms that is merely suggestive of reasons that assets became depleted falls short of the mark.")(citations omitted); *In re Lee,* 309 B.R. 468, 478 (Bankr.W.D. Tex 2004) (noting that a vague and unsupported explanation of the loss of assets is insufficient)(citation omitted)). Defendants assert that because they have accounted for nearly every penny of the Proceeds through the bank account statements, they have offered a satisfactory explanation. It is correct that the Proceeds can be traced through the bank account records. And because the nature of the expenditures is not relevant to § 727(a)(5), the Defendants have satisfied their burden. *See In re Self,* 325 B.R. 224, 250 (Bankr.N.D.Ill. 2005) ("Courts are not concerned with the wisdom of a debtor's disposition of assets, but, instead, focus on the truth, detail, and completeness of the debtor's

19

explanation of the loss.").

Quicken points out that while the bank accounts show that a significant portion of the Proceeds was used to pay off credit card balances, there is no corroborating information in the form of credit card statements that reflects whether the credit cards were used to pay for remodeling costs, regular day to day living expenses, or cash advances. However, as explained by the bankruptcy court in *In re Spitko,* 357 B.R. 272, 273 (Bankr.E.D.Pa. 2006), "[a]n interpretation of 11 U.S.C. § 727(a)(5) mandating documentary corroboration in all instances at a peril of losing a discharge would impermissibly strip purpose and meaning from 11 U.S.C. § 727(a)(3), an independent and separate basis for denying discharge." (quoting *In re Young,* 346 B.R. 597, 619 (Bankr.E.D.N.Y. 2006)).[7] The Court finds that the Defendant's testimony, corroborated by the bank account statements satisfactorily explains the loss of assets. Discharge will not, therefore, be denied under § 727(a)(5). Because § 727(a)(5) is concerned with whether the loss or dissipation of assets has been adequately explained, and not whether the debtor dissipated assets with the intent to hinder, delay, or defraud a creditor, denial of discharge under § 727(a)(2)(A) may be warranted even when the debtor gives a satisfactory explanation of a loss or dissipation of assets and sufficient to defeat a claim under §727(a)(5). *Cf. Spitko,* 357 B.R. at 323 (reasoning that the court's finding that the debtors transferred and concealed assets with intent to hinder and delay a creditor does not also "require the conclusion that the disposition of assets is unexplained.") (citation omitted).

_____

[7]*See In re Buzzelli,* 246 B.R. 75, 117-118 (Bankr.W.D.Pa. 2000) (comparing § 727(a)(3) to § 727(a)(5), and noting that under § 727(a)(3), a debtor can prevail by offering a satisfactory explanation of the lack of records, but under § 727(a)(5), if the debtor's explanation of the loss of assets is not satisfactory, the debtor must offer corroborating evidence in support of his or her testimony in order to prevail).

In conclusion, the Court finds, based on the evidence and testimony presented at trial, that Quicken has sustained its burden of proving that the Defendants should be denied a discharge under § 727(a)(2)(A) based on their disposition of the Proceeds after the sale of the Sagebrush Property.   Defendants' personal use of the Proceeds instead of paying off the Note, when Defendants knew that Quicken had a lien on the Proceeds, constituted transfers made with intent to hinder, delay, or defraud Quicken.   The Court will, therefore, deny the Defendants' discharge under § 727(a)(2)(A).  Discharge will not be denied under § 727(a)(2)(B), (a)(3), (a)(4), and (a)(5).

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law made in accordance with Rule 7052, Fed.R.Civ.P.   A judgment will be entered accordingly.


_____
MARK B. McFEELEY
United States Bankruptcy Judge

COPY TO:

Karla K Poe
Attorney for Plaintiff
PO Box 1888
Albuquerque, NM 87103-1888

George M. Moore
Attorney for Defendants
PO Box 216
Albuquerque, NM  87103-0216

Case 06-01010-m    Doc 44    Filed 09/17/07    Entered 09/17/07 09:24:11 Page 21 of 21